KDE:DGR
F. #2018R00788

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

       - against -

DERRICK AYERS,
       also known as "Mel,"
BERMON CLARKE,
       also known as "G,"
NIA GOVAN,
       also known as "Cam,"
AMANDA HUARD,
JESSICA PELKEY,
AMY SONNENBLICK,
AMANDA WALTON and
DEMETTRIUS WRIGHT,
       also known as "Clean" and
      "Meexhi Brim,"

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF AN APPLICATION FOR
ARREST WARRANTS
(T. 21, U.S.C., §§ 846, 841(b)(1)(A)(iii),
 841(b)(1)(C); T. 18, U.S.C., §§ 924(c),
 1956(h), 2 and 3551 et seq.)

No. 20-MJ-453

EASTERN DISTRICT OF NEW YORK, SS:

       ANTHONY MELCHIORRI, being duly sworn, deposes and states that he is a

Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, duly

appointed according to law and acting as such.

       In or about and between January 2017 and June 2020, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants DERRICK AYERS, also known as "Mel," BERMON CLARKE, also known as

"G," NIA GOVAN, also known as "Cam," AMANDA HUARD, JESSICA PELKEY,

AMANDA WALTON, and DEMETTRIUS WRIGHT, also known as "Clean" and "Meexhi Brim," together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute one or more controlled substances, which offense involved (a) a substance containing cocaine base, a Schedule II controlled substance, and (b) a substance containing heroin, a Schedule I controlled substance.   The amount of cocaine base involved in the conspiracy attributable to the defendants, as a result of their own conduct, and the conduct of other conspirators reasonably foreseeable to them, was 280 grams or more of a substance containing cocaine base.

(Title 21, United States Code, Sections 846, 841(b)(1)(A)(iii), 841(b)(1)(C))

In or about and between January 2017 and June 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DERRICK AYERS, also known as "Mel," and BERMON CLARKE, also known as "G," together with others, did knowingly and intentionally possess one or more firearms during and in relation to a drug trafficking crime, to wit: the drug trafficking crime set forth above.

(Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2)

In or about and between January 2017 and June 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DERRICK AYERS, also known as "Mel," BERMON CLARKE, also known as "G," NIA GOVAN, also known as "Cam," AMANDA WALTON and AMY SONNENBLICK, together with others, did knowingly and intentionally conspire to conduct financial transactions affecting interstate commerce, which in fact involved the proceeds of specified unlawful activity, to wit: narcotics trafficking, in violation of Title 21, United

States Code, Sections 841 and 846, knowing that the property involved in the financial

transactions represented the proceeds of some form of unlawful activity (a) with the intent to

promote the carrying on of the specified unlawful activity, contrary to Title 18, United States

Code, Section 1956(a)(1)(A)(i); (b) knowing that the transactions were designed in whole

and in part to conceal and disguise the nature, location, source, ownership and control of the

proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section

1956(a)(1)(B)(i); and (c) to avoid one or more transaction reporting requirements under

Federal law, to wit: Title 31, United States Code, Section 5313(a), contrary to Title 18,

United States Code, Section 1956(a)(1)(B)(ii).

      (Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

      The source of your deponent's information and the grounds for his belief are

as follows:[1]

      1.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms

and Explosives ("ATF"), and have been since 2003.   My training and experience has

included investigating crimes including the trafficking of drugs and firearms, along with the

laundering of proceeds generated through unlawful activity such as drug trafficking.   I have

participated in numerous investigations during the course of which I have, among other

things, (a) executed search warrants for electronically-stored information; (b) reviewed and

analyzed communications among members of criminal groups, including electronic messages

discussing criminal activity such as drug trafficking and firearms trafficking; (c) conducted

---

[1]    Because the purpose of this Complaint is to set forth only those facts necessary
to establish probable cause to arrest, I have not described all the relevant facts and
circumstances of which I am aware.

physical surveillance; (d) obtained and analyzed location information for cellular telephones and vehicles; and (e) reviewed surveillance footage.   I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including the defendants' criminal history records; and from reports of other law enforcement officers involved in the investigation.

2.      Based on my participation in the investigation to date, and as set forth below, the defendants DERRICK AYERS, also known as "Mel," BERMON CLARKE, also known as "G," NIA GOVAN, also known as "Cam," AMANDA HUARD, JESSICA PELKEY, AMY SONNENBLICK, AMANDA WALTON and DEMETTRIUS WRIGHT, also known as "Clean" and "Meexhi Brim," together with others, are members of an interstate drug trafficking organization operating in New York, Maine and elsewhere.   The organization has trafficked controlled substances, including cocaine base, also known as "crack," and heroin between New York and Maine using numerous vehicles and individuals to transport contraband, and using "trap" houses in Maine to store and sell narcotics.   The organization laundered the proceeds of its drug trafficking using various methods described herein.

<u>Background on the Drug Trafficking Organization</u>

3.      Based on my training, experience, and participation in the investigation to date, I am aware that BERMON CLARKE is employed by the New York City Department of Education, and has worked as a paraprofessional in a New York City public school. CLARKE is a close associate of DERRICK AYERS, who, based on my review of public posts to social media accounts used by AYERS and discussions with law enforcement officers, I know to be a member of the New York-based street gang called the "Bully Gang."

4.     In the course of the investigation, law enforcement agents have identified multiple telephones used by CLARKE and AYERS, including the following:

a.     an Apple iPhone assigned IMEI 353325072218831 ("CLARKE Phone-1");

b.     a cellular telephone assigned call number (605) 305-0306 subscribed in the name of BERMON CLARKE ("CLARKE Phone-2");

c.     an Apple iPhone assigned IMEI 355684074834179 ("AYERS Phone-1"); and

d.     an Apple iPhone assigned IMEI 354841093350337 ("AYERS Phone-2").

5.     Pursuant to judicially authorized search warrants, law enforcement agents have collected location data for CLARKE Phone-1 and CLARKE Phone-2 (collectively, the "CLARKE Phones") and AYERS Phone-1 and AYERS Phone-2 (collectively, the "AYERS Phones").   Location data for the CLARKE Phones shows that they are often in close proximity and travel together, indicating that they are used by the same person.   Location data for the AYERS Phones shows that they are often in close proximity and travel together, indicating they are used by the same person.   Physical surveillance of the location of the CLARKE Phones has found BERMON CLARKE in the vicinity of the CLARKE Phones on multiple occasions.   Physical surveillance of the location of the AYERS Phones has found DERRICK AYERS in the vicinity of the AYERS Phones on multiple occasions.   Accordingly, I believe CLARKE is the user of the CLARKE Phones and AYERS is the user of the AYERS Phones.

6.      On or about March 2, 2020, the Honorable Steven M. Gold, United States Magistrate Judge, Eastern District of New York, signed a search warrant authorizing the search and seizure of information from multiple Apple iCloud accounts, including accounts used by BERMON CLARKE ("the CLARKE iCloud") and DERRICK AYERS ("the AYERS iCloud").   A review of information seized from those iCloud accounts confirmed that the CLARKE iCloud was linked to CLARKE Phone-1 and the AYERS iCloud was linked to AYERS Phone-2.   CLARKE Phone-1 backed up data to the CLARKE iCloud and AYERS Phone-2 backed up data to the AYERS iCloud.   Among other things seized from these iCloud accounts were digital backups of the data contained on CLARKE Phone-1 and AYERS Phone-2, including messages.

7.      Based on my review of messages seized from the back up of CLARKE Phone-1, I am aware that CLARKE and AYERS operated the narcotics trafficking conspiracy through numerous text messages about the trafficking of narcotics in Maine.   For example, on or about November 2, 2019, CLARKE and the user of a telephone whose number ended in -0390 ("CC-1") had the following text message exchange:

| | |
|---|---|
| CC-1: | Didn't start the 30 yet |
| CC-1: | 12,027 everything isent together |
| CC-1: | All times y'all collected |
| CC-1: | 700 dollars the back ends of the rest of the up its alil more change then that the down money 220 that what I made since A took the last money big bro the 30 grams I'm start now In it's 5 grams of D left I'm get more money for that After that I'm done big bro school keep calling my pops phone I gotta get that out the way finish in get   shit out the way In i gotta handle my music shit to big bro but when I'm done with everything |
| CLARKE: | U gone finish the 30 n the 5 or just the 5 |
| CC-1: | The 30 in 5 big bro everything I got |

CC-1:         Im finish it all up

CLARKE:       Copy

Based on my training and experience, and my participation in the investigation to date, I believe that in this exchange, CLARKE and CC-1 were discussing the sale of narcotics. Specifically, I believe that CC-1 was informing CLARKE about starting to sell 30 grams of an unidentified drug ("the 30", "30 grams I'm start now").   Specifically, I am aware that drug dealers selling crack, heroin and other drugs often refer to drugs in gram quantities.   I further believe that in this exchange, they were discussing heroin and crack.   I believe CC-1's reference to "5 grams of D left" was a reference to 5 grams of "down," which I know to be a slang term for heroin, a depressant.   CC-1's reference to "the rest of the up" I believe was a reference to crack cocaine, which, as a stimulant, can be referred to using the slang term "up."   In addition, I believe that in this exchange, CC-1 informed CLARKE of a cash accounting related to the drug trafficking when CC-1 told CLARKE that he/she had $12,027 ("12,027 everything isent [sic] together"), and $220 related to heroin ("the down money 220").   CC-1 further told CLARKE that this money represented the amount CC-1 earned since an unidentified person named "A" picked up money from CC-1 on a prior occasion ("that what I made since A took the last money").

8.      Based on my review of messages seized from the back up of CLARKE Phone-1, I know CLARKE communicated with the user of a cellular telephone assigned a telephone number ending in -0128 ("CC-2") about drug trafficking.   For example, on or about November 10, 2019, CLARKE and CC-2 had the following exchange:

CC-2:         I gave 15340
              And I got 150

CLARKE:       Light or dark d

> CLARKE:      It's light or dark buzzin
>
> CC-2:        Light

Based on my training, experience and participation in the investigation to date, I believe that

CC-2 was informing CLARKE that he/she had given a third party $15,340 and received 150

grams of a drug ("I gave 15340 And I got 150").    Based on context, I believe this was a

reference to 150 grams of heroin.    Specifically, CLARKE asked CC-2 if he/she had "light or

dark d" which I believe was a reference to light-colored or dark-colored heroin, which, based

on my experience, I know can appear as different shades.    CC-2 confirmed he/she received

light-colored heroin.

9.    Based on my review of messages seized from the back up of CLARKE

Phone-1, I am aware that CLARKE and AYERS have discussed the drug trafficking in

Maine over CLARKE Phone-1 and AYERS Phone-1.    For example, on or about October 4,

2019, they had the following exchange:

> AYERS:      Jessica 950 cash
>             20d
>             30u
>
>                      *        *        *
>
> AYERS:      70 ⬇ 1 zip 3 fonto
>
> CLARKE:     That's for who
>
> AYERS:      Pi
>
> CLARKE:     Copy

Based on my training, experience, and participation in the investigation to date, I believe that

AYERS and CLARKE were discussing narcotics trafficking.    Specifically, AYERS told

CLARKE that an individual named "Jessica" had $950 cash, 20 grams of heroin ("20d") and

30 grams of crack ("30u").    Thereafter, AYERS stated that an unidentified individual had 70

grams of heroin ("70 ⬇").    When CLARKE asked who that amount was "for," AYERS

responded "Pi" which I believe was an abbreviation for Presque Isle, Maine.    Based on my review of location information for CLARKE Phone-1, I am aware that the device has travelled to Presque Isle, Maine.

<u>The Defendants' Use of Vehicles and Commercial Buses</u>

10.    Based on my participation in the investigation to date, I am aware that the defendants used multiple vehicles and commercial bus companies in furtherance of the drug trafficking operation.

11.    I have learned the following in sum, substance and in part concerning a 2016 Ford Fusion with a vehicle identification number ("VIN") ending in -6007 (the "2016 Fusion") and a 2015 Subaru Outback with a VIN ending in -0457 (the "2015 Outback"):

a.    I have reviewed seized messages stored in the electronic back up of AYERS Phone-2, including an August 2018 group chat between AYERS, CLARKE and GOVAN, in which they discuss the purchase of the 2015 Outback through a third party ("CC-3").    DMV records show that CC-3 registered the 2015 Outback in August 2018.

b.    On or about October 23, 2019, AMANDA HUARD registered the 2015 Outback in her name.    The same day, HUARD also registered the 2016 Fusion in her name.    Records show that the 2016 Fusion was purchased from AMANDA WALTON.

c.    Despite being registered in Maine, both the 2016 Fusion and 2015 Outback were physically present in New York on multiple occasions and used by CLARKE and AYERS.    For example, on or about November 28, 2018, CLARKE received a moving summons while he was operating the 2016 Fusion.    On or about October 25, 2019, AYERS received a speeding ticket while he was operating the 2015 Outback.

d.      Based on my training, experience, and participation in the investigation, I am aware that drug traffickers will transfer titles of vehicles to third parties and change the registered owners to try to prevent law enforcement agents from linking the vehicles to their drug trafficking activities.

12.      Based on my participation in the investigation to date, I am aware that the 2016 Fusion had a concealed compartment, known as a "trap," which was used to traffic narcotics.   In particular, based on my review of reports and discussions with law enforcement agents, I am aware that on or about November 19, 2019, following a traffic stop in New Hampshire for speeding, state law enforcement officers seized approximately 60 grams of crack cocaine from a concealed compartment in the 2016 Fusion, which, at the time of the stop, was being driven by NIA GOVAN.   As set forth below, following the stop, AMANDA HUARD gave law enforcement officers permission telephonically to release the vehicle to GOVAN, who appeared at the police station with DERRICK AYERS to retrieve the 2016 Fusion after the stop.   In particular, based on my participation in the investigation to date, I have learned the following in sum, substance and in part concerning that incident:

a.      On or about November 19, 2019, a New Hampshire State Trooper stopped the 2016 Fusion in Portsmouth, New Hampshire, as it was travelling north on Interstate 95, which road continues north to Maine.

b.      The 2016 Fusion was stopped for speeding and was driven by NIA GOVAN.

c.      During the stop, a narcotics-detecting canine alerted to the presence of narcotics on GOVAN's person and inside of the 2016 Fusion.

d.      The 2016 Fusion was seized and was subsequently searched pursuant to a judicially-authorized search warrant issued by the State of New Hampshire, Tenth District Court.

e.      During the execution of that warrant, which was not known to GOVAN, law enforcement officers discovered a concealed compartment, known as a "trap," in the 2016 Fusion, which contained approximately 60 grams of a substance that tested positive for cocaine base, also known as "crack."

f.      Law enforcement officers released the seized 2016 Fusion to GOVAN who was present at the police station with DERRICK AYERS.   The 2016 Fusion was released after HUARD—the registered owner—gave law enforcement agents permission by telephone to release the seized vehicle to third parties.

g.      On or about February 21, 2020, the Honorable Vera M. Scanlon, United States Magistrate Judge, Eastern District of New York, signed a search warrant authorizing the seizure of, among other things, cell tower location information for a cellular telephone used by NIA GOVAN ending in -4776 (the "GOVAN -4776 Phone").[2]   Based on my review of location information obtained pursuant to that warrant, I am aware that on or about November 18, 2019—the day before GOVAN was stopped and arrested in New Hampshire—the GOVAN -4776 Phone was located in Carteret, New Jersey and Brooklyn, New York.   Thereafter, between November 18, 2019 and November 19, 2019, the GOVAN

---

[2]      Based on my review of subpoenaed records, I am aware that the GOVAN -4776 Phone has been subscribed in the name "Nia Govan" and is the listed telephone number for a Facebook profile I believe is used by GOVAN based on my review of photographs publicly posted to that account that I recognize to be GOVAN (the "GOVAN Facebook"). Accordingly, I believe GOVAN is the user of the GOVAN -4776 Phone.

-4776 Phone travelled north to New Hampshire, and appeared to stop in Boston, Massachusetts along the way.   At the approximate time of GOVAN's traffic stop in New Hampshire, the GOVAN -4776 Phone was communicating with another cellular telephone used by AYERS and was located on Interstate 95 in the vicinity of where GOVAN was stopped by New Hampshire State Police.

13.    Based on the foregoing, and on my training, experience, and participation in the investigation to date, I believe that GOVAN was stopped in the 2016 Fusion while trafficking the seized crack cocaine northbound towards Maine in furtherance of the drug conspiracy.   I further believe that GOVAN, HUARD and AYERS worked to retrieve the 2016 Fusion to try to avoid law enforcement's discovery of the crack cocaine stored in the 2016 Fusion's concealed compartment.

14.    Conspirators have also been transported from New York City to Maine by bus to sell drugs as part of the conspiracy.   In particular, I have learned the following in sum, substance, and in part, concerning a November 2019 trip to Maine taken by DEMETTRIUS WRIGHT, which trip was facilitated by BERMON CLARKE and AMANDA WALTON:

a.    CLARKE saved a telephone number subscribed to by DEMETTRIUS WRIGHT under the name "Clean" in CLARKE Phone-1 (the "WRIGHT Phone").

b.    On or about November 7, 2019 at approximately 7:30 p.m., surveillance cameras at a commercial bus company in lower Manhattan captured images of an individual I recognize to be BERMON CLARKE meeting with DEMETTRIUS WRIGHT

at the bus terminal.   As captured on video, while meeting at the bus terminal, CLARKE handed WRIGHT an unknown object before leaving in a white Volvo sedan.

    c.  Surveillance cameras captured footage of WRIGHT thereafter purchasing bus tickets.   WRIGHT subsequently boarded a Boston-bound bus, which bus thereafter travelled through the Eastern District of New York.

    d.  I have reviewed location information for the WRIGHT Phone which confirms that at the approximate time WRIGHT boarded the bus and departed, the WRIGHT Phone travelled north to Boston and then on to Maine.

    e.  On November 8, 2019, at approximately 11:40 a.m., the WRIGHT Phone was sending location data from the vicinity of the bus terminal in Portland, Maine, and then ten minutes later was connecting to cell towers along Interstate 295, indicating that the WRIGHT Phone was travelling north.

    f.  Based on my review of messages sent to CLARKE Phone-1 that day, at approximately 12:07 p.m., CLARKE received the following messages from a telephone number ending in -2002, which, based on my review of records obtained by search warrant and information seized from the electronic back up of CLARKE Phone-1, I know is used by AMANDA WALTON (the "WALTON -2002 Phone"):[3]

---

[3] Based on my review of information seized from the electronic back up of CLARKE Phone-1, I am aware that CLARKE communicated with a Maine telephone number ending in -3230, which telephone number AYERS sent to CLARKE Phone-1 under the contact name "A Dubb."   I believe that "A Dubb" was a reference to the initials "A.W." for AMANDA WALTON (the "WALTON -3230 Phone").   Based on my review of location information for the WALTON -3230 Phone, I am aware that it has been located in the same vicinity as a woman who I recognize is consistent in appearance to WALTON.   Additionally, I am aware that the WALTON -3230 Phone shared a unique identifier with the WALTON -2002 Phone, which, based on my training and experience, I know can occur when the user of a cellular

> WALTON:    I don't have the car
>
> WALTON:    I have the rental
>
> WALTON:    I got the guys from the bus

Based on my review of subpoenaed records from a rental car company, on October 7, 2019, AMANDA WALTON rented a 2018 Ford Fiesta from a rental car company in Portland, Maine and used the car until November 15, 2019.   I believe that in her exchange with CLARKE on November 8, 2019, consistent with those records, WALTON was telling CLARKE that she was driving a rental car at the time.   Thereafter, I believe WALTON told CLARKE that she picked up WRIGHT from the Portland bus terminal ("I got the guys from the bus").   I have reviewed a series of videos posted to WRIGHT's social media account on November 8, 2019, in which a green roadway sign is visible through a vehicle's windshield, which sign listed among other things, two cities in Maine: Augusta, Maine and Winthrop, Maine.   A review of Google images revealed that the exit sign depicted in the video posted to WRIGHT's social media account is located on Interstate 95 in Hallowell, ME.   The interior of the vehicle in which WRIGHT was travelling was also visible in the videos, and I recognize the interior to be consistent with a 2018 Ford Fiesta, which is the vehicle WALTON was still renting as of November 8, 2019.

g.    Based on law enforcement agents' review of social media posts by WRIGHT, I am aware that between November 8, 2019 and November 19, 2019, WRIGHT posted multiple videos to the social media account that were taken inside of a home.   In those videos, WRIGHT is seen with large stacks of cash.   Based on my training,

---

device changes the telephone number assigned to their device.   Accordingly, I believe WALTON is the user of the WALTON -2002 Phone and the WALTON -3230 Phone.

experience, and participation in the investigation to date, I know that individuals engaged in drug trafficking often possess large amounts of currency as drugs being sold are paid for in cash.

15.     Based on my participation in the investigation to date, and review of location information for the WRIGHT Phone, I am aware that WRIGHT has taken multiple trips to Maine, including in or about July 2019.   Based on my review of information seized from the electronic back up of CLARKE Phone-1, I am aware that during his July 2019 trip, WRIGHT met with JESSICA PELKEY.   Specifically, on or about July 17, 2019, CLARKE had the following exchange over CLARKE Phone-1 with a contact saved as "Jess," which is a cellular telephone I know to be used by JESSICA PELKEY (the "PELKEY Phone"):[4]

PELKEY:     I love that you sent Klean he's my fav!!! ☺☺☺



PELKEY:

_____

[4]     Based on my review of subpoenaed records, I am aware that the number assigned to the PELKEY Phone, and saved as "Jess" in CLARKE Phone-1, is the listed telephone number on a Facebook account in the name of JESSICA PELKEY, which account has also posted multiple photographs of a person I recognize to be PELKEY.

Based on my training, experience, and participation in the investigation to date, I believe that in this exchange, PELKEY told CLARKE she was happy CLARKE sent WRIGHT up to Maine and referred to WRIGHT as "Klean." As noted above CLARKE saved the WRIGHT Phone under the contact name "Clean." PELKEY then sent a photograph which I recognize to be a photograph of PELKEY and WRIGHT. Thereafter, on or about July 26, 2019, while the WRIGHT Phone was still in Maine, I am aware that WRIGHT and CLARKE had the following text message exchange:

> WRIGHT:    2,600
> WRIGHT:    Its 18 onna g
> WRIGHT:    And [PELKEY's Relative] got 12 for me

Based on my training, experience and participation in the investigation to date, I believe that WRIGHT was relaying the cash total from his drug sales to CLARKE, stating that he had $2,600 ("2,600"). WRIGHT also referenced PELKEY's relative, who based on seized messages between PELKEY and CLARKE, I am aware owed money for drugs.

### The Defendants' Operation of Drug "Trap" Houses in Maine

16.    Based on my participation in the investigation to date, I am aware that as part of the conspiracy, in addition to the locations used during WRIGHT's trip to Maine, the defendants have used multiple "trap" houses to store and sell drugs.

17.    Based on my review of messages seized from the electronic back up of CLARKE Phone-1, I am aware that these "trap" houses would sometimes be assigned a designated cellular telephone that the drug dealer assigned to that house would use to conduct drug business over and communicate with CLARKE and AYERS. For example, on or about October 4, 2019, AYERS messaged CLARKE an Apple "contact card" for a contact

saved as "Levant Trizzy" with a Maine telephone number ending in -0342.   I am aware that

"Levant" is the name of a town in Maine.   Based on my review of messages seized from the

back up of CLARKE Phone-1, I believe that "Trizzy" was a slang term for "Trap" which is a

term used to describe a location from which drugs are held and sold.

18.     Similarly, AYERS also sent CLARKE a contact card for a contact

saved as "Pi Trizzy," which I believe was a contact card for a "trap" house in Presque Isle,

Maine ("Pi"), which, as noted above, is a location in reference to which AYERS and

CLARKE have discussed the sale of narcotics.   Based on my review of messages sent by

AYERS, I am aware that he sent CLARKE multiple contact cards referencing other towns in

Maine that I believe were also trap houses from which the SUBJECT INDIVIDUALS sold

narcotics, including telephone numbers relating to Jay, Maine ("Jay Trap") and Detroit,

Maine ("Detroit Trizzy").

19.     I am aware that CLARKE communicated with these numerous "trap"

phones about selling drugs.   For example, saved in CLARKE Phone-1 were messages

between CLARKE and a Maine telephone number ending in -9153, which CLARKE saved

in CLARKE Phone-1 as "Jay Trap."   Based on my training, experience and participation in

the investigation to date, I am aware that "Jay" is the name of a town in Maine.   As set forth

above, I am aware that the term "Trap" is a term used to describe locations from which drugs

are stored and sold.

20.     Based on my review of messages seized from the back up of CLARKE

Phone-1, I believe CLARKE communicated with "Jay Trap" about drug trafficking.   For

example, on or about July 16, 2019, the user of the "Jay Trap" phone messaged CLARKE,

"2175 here 2400 Lindsay 90g up 40gs in 5 50gs in one 11g down left Plus 50 so 61."   Based

on my training, experience, and investigation of this case to date, I believe that in that message, the user of the "Jay Trap" phone was informing CLARKE that he/she had $2,175, 90 grams of crack cocaine ("90g up") and 11 grams of heroin ("11g down left").

21.    Also saved in CLARKE Phone-1 were addresses for multiple locations in towns across Maine including an address for a house on Bings Boulevard, Swanville Maine (the "Bings House") and an address for a house on Woodpecker Drive, Troy Maine (the "Woodpecker House").   On or about August 8, 2019, CLARKE sent AYERS a message from CLARKE Phone-1 listing drug counts at multiple addresses including the following: "[House number] woodpecker dr Troy me (50u +25d)" and "[House number] bings lane Swanville (70u)".   Based on my training, experience, and participation in the investigation to date, I believe that CLARKE was sending AYERS an update on the drug counts and money held at the Woodpecker House and the Bings House.   Specifically, I believe CLARKE told AYERS that there were 50 grams of crack ("50u") and 25 grams of heroin ("25d") at the Woodpecker House and 70 grams of crack ("70u") at the Bings House.

22.    In the course of the drug conspiracy, NIA GOVAN and AMANDA WALTON helped CLARKE and AYERS coordinate the distribution of narcotics and collection of proceeds from that unlawful activity.   Based on my review of messages seized from the electronic back up of CLARKE Phone-1, along with my review of subpoenaed records and cellular phone location information, I have learned the following, in sum, substance, and in part:

a.    Based on my review of messages between CLARKE Phone-1 and the WALTON -3230 Phone, I am aware that CLARKE and WALTON communicated

about drug trafficking in numerous messages.   For example, on or about November 9, 2019

and November 10, 2019, WALTON and CLARKE had the following exchange:

> WALTON:    Q- 22u 12d
> Clean- 11d 41u
> Troy ?
> Dj 27u 15d
>
> Q 50d 25u
> Clean- 50d
> Troy 50u
> Dj 50d 25u
> Jay 60u 50d

> WALTON:    The bottom list is my suggestion on what gets sent

> CLARKE:    Keep what I said for the d and do what u just sent for the u

Based on my training and experience, I believe that in this exchange, WALTON and

CLARKE were discussing drug trafficking and the amounts of drugs and money at various

"trap" houses in Maine.   Specifically, I believe that WALTON first told CLARKE the

amounts of drugs held by individuals or locations referred to as "Q" "Clean" "Troy" and

"Dj."   In particular, WALTON stated that "Q" had 22 grams of crack and 12 grams of

heroin ("22u 12d"), "Clean"—who as set forth herein is DEMETTRIUS WRIGHT—had 11

grams of heroin and 41 grams of crack ("11d 41u"), "Troy" had an unknown amount ("?")

and "Dj" had 27 grams of crack and 15 grams of heroin ("27u 15d").

   b.    Thereafter, WALTON sent CLARKE a list for the same

individuals or places and added "Jay," which I know to be a town in Maine.   In that second

list, WALTON gave CLARKE a "suggestion" as to the amounts of crack and heroin that

each person or location should receive ("The bottom list is my suggestion on what gets

sent").   CLARKE instructed WALTON to use the amounts of heroin he suggested ("keep

what I said for the d") and said to use WALTON's suggested amounts for the crack ("do

what u just sent for the u").    Thereafter, CLARKE and WALTON continued their exchange:

> WALTON:    Am i going with her or by yourself
>
> CLARKE:    Idk
>
> CLARKE:    Ask bro
>
> WALTON:    Jay 12376 +60u 50d
>
> WALTON:    Rob- 6875 +50u
>
> WALTON:    Clean 2,000 +50d
>
> WALTON:    Dj 5523 +50d 24u
>
>           *     *     *
>
> WALTON:    Ash- 15340 +150d
>
> CLARKE:    Light d for ash right
>
> WALTON:    Yes

Based on my training, experience and participation in the investigation to date, I believe that in this exchange, WALTON asked CLARKE whether she would be travelling to the stash houses with a third party ("Am I going with her or by yourself [sic]").    CLARKE said he did not know and told WALTON to ask "bro," which I believe was a reference to AYERS. Thereafter, in a series of messages, which were sent over the course of eleven hours, WALTON reported the counts of crack and heroin—e.g., 60 grams of crack and 50 grams of heroin for "Jay" (60u 50d")—along with counts of money—e.g., $12,376 for "Jay" ("Jay 12376").    I believe WALTON's reference to "Ash" was a reference to Ashland, Maine, and that she reported that there were 150 grams of heroin at that location ("150d").    Thereafter, CLARKE confirmed the color of heroin asking if it was light-colored ("Light d for ash").    I believe that WALTON was sending counts of money she collected and amounts of drugs presently with the individuals or locations.    First, given the lapse of time between the messages, I believe WALTON was travelling to different locations to count the money and drugs being relayed to CLARKE in these messages.    In addition, based on my review of

location information for WALTON's cellular telephone during that same time period, I am aware that it was moving throughout numerous towns in Maine, including Ashland, Maine ("Ash") and Jay, Maine ("Jay") while relaying those counts back to CLARKE.

23.     Based on my participation in the investigation to date, I am aware that other members of the conspiracy, including NIA GOVAN, have also travelled to the "trap" houses the defendants are operating.

24.     On or about May 12, 2020, the Honorable John C. Nivison, United States Magistrate Judge, District of Maine, signed a search warrant authorizing the installation and use of an electronic tracking device on the 2015 Outback.   Based on my review of location information for cellular telephones, surveillance footage, pole camera footage and GPS location information for the 2015 Outback, I am aware that on or about May 18 and May 19, GOVAN and WALTON travelled through Maine stopping at multiple residences, including the Bings House and the Woodpecker House:

a.     On May 18, 2020 at approximately 3:42 p.m., location information for a cellular telephone ending in -9977 used by NIA GOVAN (the "GOVAN -9977 Phone"),[5] obtained pursuant to a judicially-authorized search warrant, showed that the GOVAN -9977 Phone was near 15 Clementine Park, Boston Massachusetts, which, per Massachusetts DMV records, is the listed residence of GOVAN (the "GOVAN Residence") and the 2015 Outback registered in her name.   At 4:12 p.m., the GOVAN -9977 Phone was travelling north towards Maine.

---

[5]     Based on my review of subpoenaed records, I am aware that the GOVAN -9977 Phone is a listed telephone number for the GOVAN Facebook.

b.      At 5:42 p.m., the GOVAN -9977 Phone was a short distance from 76 Wilson Street, Portland, Maine ("76 Wilson Street").   Based on my participation in the investigation to date, I am aware that 76 Wilson Street is an apartment building at which cellular telephones for AYERS, CLARKE, GOVAN, WALTON, and others, have sent location information on multiple occasions.   Additionally, in the course of the investigation, a pole camera was installed near 76 Wilson Street (the "Wilson Street Pole Camera") and has captured images of AYERS, GOVAN, CLARKE, WALTON and others entering 76 Wilson Street.   Based on my review of subpoenaed records, I am aware that AYERS, CLARKE and WALTON have each made payments to the landlord of 76 Wilson Street.   I am also aware that GOVAN has paid for electricity at 76 Wilson Street.

c.      After the GOVAN -9977 Phone sent location information from 76 Wilson Street, at approximately 5:47 p.m., a woman wearing a hooded sweatshirt was captured on the Wilson Street Pole Camera entering 76 Wilson Street with a duffle bag. Taken together, I believe GOVAN was the woman seen entering 76 Wilson Street at that time.

d.      GPS information for the 2015 Outback showed that it remained in the vicinity of 76 Wilson Street until 7:44 p.m., when it began driving north.   Based on my review of location information for the GOVAN -9977 Phone, I am aware that the device's movements were consistent with the 2015 Outback.   Accordingly, I believe GOVAN was travelling in the 2015 Outback.

e.      I am also aware that GOVAN was travelling with WALTON. Specifically, at approximately 10:31 p.m. the 2015 Outback stopped at a gas station in Waterville, Maine.   I have reviewed surveillance footage obtained from the gas station for

the approximate time that the 2015 Outback was stopped, and, I am aware that it shows, in

sum and substance, that the 2015 Outback arrived at the gas station, and that a woman in a

pink sweatshirt exited the passenger door and entered the gas station.    Cameras inside

captured images of the woman in the pink sweatshirt, which I recognize to be AMANDA

WALTON.    WALTON exited the gas station, entered the passenger side of the 2015

Outback and departed.    Location information for the GOVAN -9977 Phone moved

consistently with the 2015 Outback.    Accordingly, I believe that GOVAN was driving the

2015 Outback during the trip along with WALTON as a passenger.

        f.      Thereafter, the 2015 Outback and the GOVAN -9977 Phone

travelled south towards Troy, Maine and, at 11:47 p.m., the 2015 Outback stopped at the

Woodpecker House.    Location information for the GOVAN -9977 Phone showed that it was

also in Troy, Maine at that time.    The 2015 Outback remained at the Woodpecker House for

approximately 13 minutes before departing.

        g.      The 2015 Outback then travelled to Swanville, Maine and, at

approximately 12:32 a.m. on May 19, 2020, it stopped at the Bings House.    The 2015

Outback remained at the Bings House for approximately 52 minutes before departing at 1:24

a.m.    There was no location information sent from the GOVAN -9977 Phone while the 2015

Outback was stopped at the Bings House.    However, the GOVAN -9977 Phone sent location

information at approximately 1:43 a.m. and travelled consistently with the 2015 Outback

thereafter.

        h.      Thereafter, the 2015 Outback departed and drove back to the

vicinity of 76 Wilson Street, where images of the vehicle were captured on the Wilson Street

Pole Camera at 3:18 a.m. before the vehicle stopped on a nearby block at 3:20 a.m.    At

approximately 3:43 a.m., the GOVAN -9977 Phone sent location information from the vicinity of 76 Wilson Street.

i.      Based on my training, experience, and participation in the investigation to date, I believe that GOVAN and WALTON were travelling throughout Maine together, visiting stash houses operated in furtherance of the drug conspiracy.   I believe GOVAN and WALTON travelled in the middle of the night to minimize the risk of law enforcement surveillance and detection.   I further believe the short duration spent at each of the residences discussed above is consistent with stopping at each location to count and pick up drug trafficking proceeds and/or to deliver drug supplies.   As discussed above, the defendants have used numerous "trap" houses to traffic narcotics as shown by CLARKE and AYERS' text message exchange about the Bings House and the Woodpecker House recounted above.

25.     Based on my participation in the investigation to date, including my review of location information or cellular telephones, pole camera footage and GPS location information for the 2015 Outback, I am aware that the 2015 Outback and the GOVAN -9977 Phone travelled to these "trap" houses on multiple other occasions, often in the middle of the night, with stops of similarly short durations to those discussed above, including as set forth below.

| Date | Time | Location | Duration |
|---|---|---|---|
| **May 13 to May 14** | | | |
| May 13, 2020 | 11:46 PM | The Woodpecker House | 29 min |
| May 14, 2020 | 1:56 AM | The Bings House | 46 min |

| May 14, 2020 | 6:30 AM | Vicinity of 76 Wilson Street | N/A |
|---|---|---|---|
| **May 15 to May 16** | | | |
| May 15, 2020 | 11:00 PM | The Woodpecker House | 32 min |
| May 16, 2020 | 5:23 AM | The Bings House | 72 min |
| May 16, 2020 | 8:30 AM | Vicinity of 76 Wilson Street | N/A |
| **May 20 to May 21** | | | |
| May 21, 2020 | 4:34 AM | The Woodpecker House | 17 min |
| May 21, 2020 | 6:30 AM | Vicinity of 76 Wilson Street | N/A |
| **May 22 to May 23** | | | |
| May 23, 2020 | 12:56 AM | The Woodpecker House | 21 min |
| May 23, 2020 | 2:08 AM | The Woodpecker House | 9 min |
| May 23, 2020 | 10:41 AM | The Bings House | 55 min |
| May 23, 2020 | 1:42 PM | Vicinity of 76 Wilson Street | N/A |
| **May 25 to May 26** | | | |
| May 26, 2020 | 4:11 AM | The Woodpecker House | 18 min |
| May 26, 2020 | 5:08 AM | The Bings House | 23 min |
| May 26, 2020 | 7:33 AM | Vicinity of 76 Wilson Street | N/A |

For the same reasons set forth above, based on my training, experience and participation in the investigation to date, I believe that these trips were taken by GOVAN to stop at "trap" houses from which GOVAN and the defendants collected money and delivered narcotics in furtherance of the drug conspiracy.

The Laundering of Drug Trafficking Proceeds

26.    Based on my participation in the investigation to date, as set forth below, I am aware that the defendants DERRICK AYERS, also known as "Mel," BERMON CLARKE, also known as "G," NIA GOVAN, also known as "Cam," AMANDA WALTON and AMY SONNENBLICK, together with others, have facilitated the drug trafficking operation by laundering its proceeds through, among other things, bank deposits, wire transfers and the acquisition of high-dollar assets like vehicles.

27.    I have reviewed bank records for a bank account with an account number ending in -6266, which was opened in the name of AMANDA WALTON (the "WALTON Bank Account").   As set forth below, based on my review of those records, I am aware that there have been large cash deposits into the WALTON Bank Account in dollar amounts consistent with the amounts of money CLARKE has discussed with co-conspirators in messages seized from CLARKE Phone-1.   As set forth below, I believe these deposits were the proceeds of drug trafficking and that the transactions were designed to launder those funds by concealing the true source of the funds through the deposit before disbursing them to members of the conspiracy and to promote the ongoing drug trafficking crimes. Specifically, based on my review of records for the WALTON Bank Account, I have learned the following in sum, substance and in part:

a.    On or about August 27, 2019, $5,060 in cash was deposited into the WALTON Bank Account at an ATM in Falmouth, Maine.   The same day $2,500 was wire transferred to a bank account in the name of DERRICK AYERS.   Three days later, an additional $1,735 was wire transferred to AYERS.

b.        On or about October 7, 2019, $3,335 in cash was deposited into the WALTON Bank Account at an ATM in Belfast, Maine.    Six days later, an additional $4,650 in cash was deposited into the WALTON Bank Account at an ATM in Belfast, Maine.    On October 15, 2019, $393 was wire transferred to DERRICK AYERS.    On October 22, 2019, $110 was wire transferred to AYERS.    On October 24, 2019, $2,500 was wire transferred to AYERS.    On or about October 27, 2019, $3,459 in cash was deposited into the WALTON Bank Account at an ATM in Falmouth, Maine.    On November 4, 2019 and November 5, 2019, there were three wire transfers to AYERS totaling $320, there were also cash withdrawals totaling $303.50 were made from the WALTON Bank Account from ATMs in Brooklyn, New York.

c.        On November 6, 2019, $7,000 in cash was deposited into the WALTON Bank Account.    The same day, there was a series of cash withdrawals from the WALTON Bank Account made in New York City, which totaled $8,530.

d.        GOVAN and SONNENBLICK have also received wire transfers from the WALTON Bank Account.

e.         Based on my training, experience, and participation in the investigation to date, given the size, timing and location of the foregoing transactions, I believe that they were cash deposits of proceeds from drug trafficking in Maine that were collected in Maine and deposited into the WALTON Bank Account at banks and ATMs in Maine, a portion of which were then withdrawn in cash or wire transferred to AYERS.    I believe WALTON acted as an intermediary in these transactions to obscure the true source of the funds.

28.    In addition to laundering proceeds through bank deposits and wire transfers, proceeds generated by the defendants' drug trafficking operation were also laundered through the acquisition of vehicles.

29.    For example, based on my review of subpoenaed records, I have learned the following in sum, substance, and in part concerning AMY SONNENBLICK's acquisition of a 2015 Range Rover used by AYERS:

a.    Based on my review of subpoenaed records, I am aware that SONNENBLICK has been employed as a paraprofessional by the New York City Department of Education.

b.    Based on my review of subpoenaed records, I am aware that on or about September 5, 2018 and September 6, 2018, a person close to DERRICK AYERS ("CC-5") attempted to purchase a similar Range Rover from two different auto dealers, offering more than $20,000 in cash as a deposit each time, but was denied.

c.    On or about September 6, 2018, AMY SONNENBLICK purchased a white 2015 Range Rover (the "Range Rover") with $20,000 in cash as a down payment and an auto loan of $48,433.   I am also aware that SONNENBLICK listed the address for CC-5 in connection with the purchase, including her title application for the Range Rover.

d.    Beginning in February 2019, SONNENBLICK began aggressively paying off the auto loan for the Range Rover in $7,000 to $10,000 payments, each of which were preceded by cash deposits of $7,000 to $10,000 into a bank account in her name (the "SONNENBLICK Bank Account").

e.      On or about February 27, 2019, SONNENBLICK deposited $9,000 in cash into the SONNENBLICK Bank Account.   The same day, SONNENBLICK paid $10,000 off on the loan for the Range Rover.   As set forth in the chart below, SONNENBLICK followed the same pattern until the Range Rover was paid off, keeping her cash deposits to $10,000 or less, which, based on my training and experience, I know to be a way in which money launderers evade the currency transaction reporting requirements, which are triggered by deposits of cash greater than $10,000:

| March 18, 2019 | $9,800 cash deposit |
| March 18, 2019 | $10,000 payment for Range Rover |
| April 15, 2019 | $9,900 cash deposit |
| April 15, 2019 | $10,000 payment for Range Rover |
| May 20, 2019 | $8,000 cash deposit |
| May 21, 2019 | $7,446 payoff for Range Rover |

f.      Despite being purchased and paid off by SONNENBLICK, I am aware that CLARKE and AYERS used the Range Rover:

i.      On or about November 14, 2018, CLARKE received a traffic citation while driving the Range Rover.

ii.      Based on my review of videos and pictures seized from the electronic back up of AYERS Phone-2, I am aware that pictures and videos recorded on or about September 6, 2019 were saved to AYERS Phone-2 that depicted AYERS and CLARKE at what appeared to be a birthday party at a restaurant.   I am aware that AYERS' birthday is September 6.   In one of the videos, AYERS appeared to receive as a gift a white Range Rover, which I recognize to be the Range Rover as shown in the following photographs stored on AYERS Phone-2:





I recognize DERRICK AYERS to be the person depicted in the second photograph inside of the Range Rover.

g.    Taken together, based on my training, experience, and participation in the investigation to date, I believe that SONNENBLICK acted as an intermediary to purchase the Range Rover after CC-5 was denied on two occasions attempting to purchase the same vehicle with more than $20,000 in cash as a down payment. I believe SONNENBLICK was used as an intermediary to obscure the true source of funds for the purchase of the Range Rover, which, I believe to be proceeds from AYERS and CLARKE's drug trafficking activity with the other defendants.

<u>AYERS and CLARKE's Possession of Firearms</u>

30.    Based on my participation in the investigation to date, I am aware that in the course of the drug trafficking conspiracy described above, AYERS and CLARKE illegally possessed firearms.   For example, based on my review of messages seized from the electronic back up of CLARKE Phone-1, I am aware that on or about August 25, 2019, an individual ("CC-6") messaged CLARKE about a third party ("CC-7") purchasing a firearm:

| | |
|---|---|
| CC-6: | [CC-7's name] |
| CC-6: | Gonna got get the grip |
| CC-6: | U want [CC-7] too |

Based on my training, experience, and participation in the investigation to date, I believe that in these messages, CC-6 was telling CLARKE that CC-7 would go purchase a firearm ("get the grip").   Seized messages show that approximately five hours later, CC-6 and CLARKE discussed the purchase of the firearm and referenced an another co-conspirator involved in the firearms purchase ("CC-8") in the following exchange:

| | |
|---|---|
| CC-6: | Wat u want to pay them |
| CLARKE: | 2g [CC-8] 1g [CC-7] |
| CC-6: | [he/she] gave me money |

CLARKE:      Receipts

CLARKE:      ?

CLARKE:      How much $

CC-6:        Yea

CC-6:        Did [he/she] pass the money

CC-6:        740

CLARKE:      That's wat [he/she] gave back

CLARKE:      Wat [he/she] gave back plus grip equals out to what u sent em out with

CC-6:        Yes

*       *       *

CLARKE:      They bring box n shit back

CLARKE:      Send pic of open box n wats left in it

CC-6:        Huh

CLARKE:      Did [he/she] bring the case the grip was in

CC-6:        No

CLARKE:      Ask [he/she] where it's at

CC-6:        Yes [he/she] got everything

CLARKE:      Send pic



CC-6:

Based on my training, experience, and participation in the investigation to date, in that

exchange, CLARKE and CC-6 were discussing the purchase of a firearm.   Specifically,

CC-6 asked how much he should pay "them" which I believe was a reference to CC-7 and CC-8 as payment for purchasing the firearm.    CLARKE told CC-6 to pay them in drugs ("2g [CC-8] 1g [CC-7]").    CLARKE discussed the total money owed, and clarified how much the firearm cost, referring to the firearm with the slang term "grip."    CLARKE specifically asked if one of the co-conspirators ("he/she") brought "the case the grip was in" and asked CC-6 to send a picture of the box.    Thereafter, CC-6 sent a photograph of a gun box for what I recognize to be a Glock pistol and is the type of box in which new Glock firearms are sometimes sold.

31.    Based on my review of Maine DMV records, I am aware that DERRICK AYERS registered a 2014 Kia Cadenza with a VIN ending in -2930 (the "2014 Kia") in his name with Maine license plate "3348VU" (the "3348VU Plate").    Based on my review of Maine law enforcement records, I am aware that the 3348VU Plate was queried by a law enforcement officer in Penobscot County, Maine on or about August 19, 2017.    Based on my training and experience, I believe the 2014 Kia was in Maine at that time.

32.    On or about November 21, 2017, the NYPD impounded the 2014 Kia. The 2014 Kia remained in NYPD custody thereafter and was never retrieved.

33.    On or about December 17, 2019, the Honorable Robert M. Levy, United States Magistrate Judge, Eastern District of New York, signed a search warrant authorizing the search of the 2014 Kia, which search was executed on or about December 18, 2019.    In the course of the search of the 2014 Kia, law enforcement officers discovered a concealed compartment, or "trap," inside the 2014 Kia.    Inside that concealed compartment, law enforcement officers seized a .38 caliber revolver and a magazine filled with 5.7 x 28mm caliber ammunition.

WHEREFORE, your deponent respectfully requests that defendants DERRICK AYERS, also known as "Mel," BERMON CLARKE, also known as "G," NIA GOVAN, also known as "Cam," AMANDA HUARD, JESSICA PELKEY, AMY SONNENBLICK, AMANDA WALTON, and DEMETTRIUS WRIGHT, also known as "Clean" and "Meexhi Brim," be dealt with according to law.

I further request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the affidavit and arrest warrant. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and arrest warrants via the internet.   Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the investigation.

ANTHONY MELCHIORRI
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to before me telephonically this 18th day of June, 2020

THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK